Index No.  CV 07 4017 (RPP)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STANDISH DUBLIN,

Plaintiff,

- against -

THE CITY OF NEW YORK, *et al.*

Defendant.

**DEFENDANT'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION TO DISMISS
AMENDED COMPLAINT**

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Deborah Dorfman*
*Tel:  (212) 788-0408*
*NYCLIS No. 2007-030307*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................1

STATEMENT OF FACTS ...............................................................................2

POINT I: STANDARDS FOR DISMISSAL UNDER FED.
R. 12(b)(6) AND 12(b)(1)...............................................................................3

POINT II: ...PLAINTIFF IS BARRED FROM RECEIVING COMPENSATORY DAMAGES
BY THE PRISON REFORM LITIGATION
ACT..................................................................................................................3

POINT III: PLAINTIFF FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE
GRANTED.......................................................................................................5

    A.    Alleged Unconstitutional Conditions of Confinement................................5

        1.    Eighth Amendment Requirements....................................5

            a.    The Deprivation Must Be "Sufficiently Serious"...........6

            b.    Defendants Must Act With a Culpable State of Mind.......6

        2.    Fourteenth Amendment Requirements................................7

        3.    Overcrowding.......................................................8

        4.    Inadequate Sleeping Space.......................................10

        5.    Toiletries........................................................12

        6.    Laundry Services.................................................10

        7.    Plaintiff Housed with Inmate Who Tested Positive for
            Tuberculosis......................................................13

        8.    Tray Thrown at Plaintiff.........................................15

        9.    Exercise, Recreation, Law Library, Sick Call, Commissary, Meals,
            and Services in the CPSU.........................................16

            a.    Exercise & Recreation.......................................16

            b.    Law Library................................................17

**Page**

    c.  Sick Call, Meals, & Commissary.............................18

    d.  CPSU...........................................................19

   10. Staffing and Off-Housing Unit  Activities..........................20

   11. Unsanitary Conditions................................................21

 B. Plaintiff Has Failed to Allege A Viable *Monell* Claim.............................22

POINT IV: CLAIMS AGAINST DEFENDANTS HORN, HOURIHANE, LANGSTON, AND DAVIS SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS NOT ALLEGED THEIR PERSONAL INVOLVEMENT IN THE INCIDENTS ALLEGED IN THE COMPLAINT ..................................................................................... 23

POINT V: PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR LACK OF STANDING  .........................................................................24

CONCLUSION.................................................................25

**APPENDICES:**

Appendix I: Amended Complaint

Appendix II: The City of New York Board of Correction Minimum Standards for New York City Correctional Facilities, §§ 1-07, 1-09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

STANDISH DUBLIN,

                                                        **07 CV 4017 (RPP)**

                                        Plaintiff,

        -against-

THE CITY OF NEW YORK, *et al.*,

                                        Defendants.

------------------------------------------------------------------------ x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLIANT

## PRELIMINARY STATEMENT

Plaintiff filed his Amended Complaint in December of 2007, alleging inadequate conditions of confinement while incarcerated at the Otis Bantum Correctional Center ("OBCC") and the Eric M. Taylor Center ("EMTC") on Rikers Island. The allegations in the amended complaint primarily involve overcrowding, which allegedly led to inadequate access to personal supplies, laundry services, and recreation, among other complaints. Defendants now respectfully move this Court to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 12 (b)(1) on the grounds that: 1) plaintiff is barred from obtaining compensatory damages by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(e), because he has failed to allege any actual physical injury; 2) plaintiff has failed to state a claim upon which relief can be granted since he has failed to allege facts sufficient to state constitutional violations as to his conditions of confinement; 3) because plaintiff has failed to allege claims sufficient to rise to the level of a constitutional violation, he cannot prove a *Monell* claim against defendant New York City; 4) plaintiff has failed to allege sufficient facts that the named defendants had personal involvement

in the incidents and occurrences alleged in the Amended Complaint for damages under §1983; and 5) plaintiff lacks standing to bring claims for which he has alleged no injury in fact, and this Court thus lacks subject matter jurisdiction over those claims.

## STATEMENT OF FACTS

Plaintiff alleges numerous problems with conditions at OBCC and EMTC on Rikers Island resulting from overcrowding. *See generally* Amended Complaint (hereinafter "Compl."), attached hereto as Appendix I. The OBCC is a facility for pretrial detainees and the EMTC houses only convicted inmates. Specifically, plaintiff alleges that the OBCC and the EMTC were overcrowded and as a result: [1] 1) there was inadequate sleeping area space in the OBCC; 2) the OBCC and the EMTC were infested with mice, roaches, and other vermin, which would consume plaintiff's food purchased from the commissary; 3) plaintiff was deprived of "hygiene items such as toothpaste, soap, detergent, and toilet paper"; 4) plaintiff wore the same jumper for two weeks because EMTC did not have enough jumpers large enough to fit plaintiff; 5) plaintiff had to launder his clothes himself; 6) plaintiff's opportunity to take part in activities was limited because several activities were often offered at the same time; 7) plaintiff was housed with an inmate who tested positive tuberculosis ("TB"); 8) an inmate threw a tray at plaintiff in the EMTC mess hall; 9) plaintiff could not attend some activities at the EMTC, including religious services, because a DOC officer was not available to escort him; 10) plaintiff sometimes went to sick call during the evening when it was less crowded; 11) some prison services were unavailable in solitary confinement ("CPSU") and when in CPSU, plaintiff did not go to the yard because he feared gang members. *See generally* Compl. Plaintiff alleges that the above allegations "have caused genuine deprivation and hardship" and are "incompatible with contemporary standards of decency, cause wanton and unnecessary infliction of pain, and are not

---

[1] The allegations refer to conditions in both the OBCC and EMTC unless otherwise specified.

reasonably related to any legitimate penological objectives." Compl. ¶ 32. Plaintiff asks for compensatory damages and attorneys' fees. *Id.*, ¶. 12.

## POINT I

### STANDARDS FOR DISMISSAL UNDER FED. R. CIV. P. 12(B)(6) AND 12(B)(1)

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the allegations in the complaint are accepted as true. *Grandon v. Merrill Lynch*, 147 F.3d 184, 188 (2d Cir. 1998); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

The standards for determining a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) are "substantively identical" except that for the purposes of a 12(b)(1) motion, it is the party "invoking the jurisdiction of the court" that has the burden of proof. *Lerner v. Fleet Bank*, 318 F.3d 113, 128 (2d Cir.), *cert. denied*, 540 U.S. 1012, 124 S. Ct. 532, 157 L. Ed. 2d 424 (2003). Additionally, unlike on a 12(b)(6) motion, the court can consider additional papers and affidavits submitted by the moving party in support of the motion. *De Yu Zhang v. U.S. Citizenship and Immigration Service*, No. 05 Civ. 4086, 2005 U.S. Dist. LEXIS 26805, at *13 (S.D.N.Y. Nov. 8, 2005).[2] For the reasons set forth below, the claims in the Complaint should be dismissed in their entirety against all defendants.

## POINT II

### PLAINTIFF IS BARRED FROM RECEIVING COMPENSATORY DAMAGES BY THE PRISON REFORM LITIGATION ACT

---

[2] However, in a 12(b)(6) motion a court may consider documents for which it can take judicial notice. *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002).

- 3 -

The Amended Complaint should be dismissed pursuant to the Prison Reform Litigation Act ("PLRA"), 42 U.S.C. § 1997e(e) because plaintiff has failed to allege any physical injuries. *See* Compl. Section 1997e(e) of the PLRA states, in relevant part, that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Courts in this District and in the Second Circuit have repeatedly held that where a prisoner, as defined under the PLRA, has failed to allege any physical injury, his or her claims for compensatory damages must be dismissed. *See Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999); *Voorhees v. Goord*, No. 05 Civ. 1407, 2006 U.S. Dist. LEXIS 48370 (S.D.N.Y. Feb. 24, 2006) (compensatory damages claims dismissed where inmate alleging custodial assault and threats by a correction officer failed to allege actual physical injury); *Brewster v. Nassau County*, 349 F. Supp. 2d 540, 553 (E.D.N.Y. 2004) (defendants' motion to dismiss granted where prisoner plaintiff failed to allege any physical harm.). This restriction on the recovery of compensatory damages under the PLRA is equally applicable to former prisoners. *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 456-57 (S.D.N.Y. 2004) (*citing Cox v. Malone*, 199 F. Supp. 2d 135, 140 (S.D.N.Y. 2002), *aff'd*, 56 Fed. Appx. 43 (2d Cir. 2003)) ("The fortuity of release on parole does not affect the kind of damages that must be alleged in order to survive the gate-keeping function of section 1997e(e). Because plaintiff's suit alleges only emotional injuries, it is barred by the PLRA irrespective of his status as a parolee at the time of filling.").

Here, plaintiff has not alleged any actual physical harm resulting from the conditions about which he complains. *See generally* Compl. He claims he was struck by a food tray during an altercation with another inmate but does not allege resulting injury. *Id.* ¶ 23.

Other than that allegation, plaintiff only alleges harm in a vague and conclusory manner by alleging that defendants' actions or inactions have caused him "genuine deprivation and hardship" and have resulted in "wanton and unnecessary infliction of pain. *Id.* ¶ 32. He also makes a conclusory allegation that "as a result of the facts alleged he sustained physical, psychological emotional injury" but nothing more. *Id.*, ¶ 48. Such allegations are not sufficient to meet the requirements of an actual physical injury as required by the PLRA. Thus, plaintiff's claims for compensatory damages are barred by the PLRA and must be dismissed.

## POINT III

### PLAINTIFF FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

In spite of notice pleading requirements under Fed. R. Civ. P. 8., "[a] civil rights complaint 'must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under §1983.'" *Williams v. City of New York*, 03 Civ. 5342, 2005 U.S. Dist. LEXIS 26143, at *8-9 (*quoting Vishevnik v. Supreme Court*, No. 99 Civ. 3611, 1999 U.S. Dist. LEXIS 15516, at *2 (S.D.N.Y. Oct. 6, 1999)). Here, as discussed below, plaintiff's claims are conclusory and fail to establish a claim under §1983.

**A.    Alleged Constitutional Violations for Inadequate Conditions of Confinement**

**1.    Eighth Amendment Requirements**

The applicable analysis of a convicted inmate's constitutional claims regarding conditions of confinement is under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). "The Eighth Amendment prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995). The Supreme Court has determined this to include punishments

- 5 -

that "involve the unnecessary and wanton infliction of pain." *Id.* (*citing Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). While the Constitution prohibits inhumane conditions for prisoners, it "does not mandate comfortable prisons." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (*quoting Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)) (internal quotations omitted).

### a.    The Deprivation Must Be "Sufficiently Serious"

In order for a prisoner to establish constitutional violations relating to his conditions of confinement, the plaintiff must meet a two prong test. First, the plaintiff must show that the deprivation is "sufficiently serious" or that there exists a "substantial risk of serious harm" to the prisoner. *Farmer*, 511 U.S. at 834. A prisoner's discomfort in his living environment while incarcerated is insufficient to establish a constitutional violation. *Jones* v. *Goord*, 435 F. Supp. 2d 221, 234-35 (S.D.N.Y. 2006) (*quoting Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (*quoting Rhodes*, 452 U.S. at 347, 349)). Rather, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of "the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347.

### b.  Defendants Must Act With a Culpable State of Mind

The second prong of the deliberate indifference test requires plaintiff to show that defendants acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 *citing Wilson*, 501 U.S. at 297. What constitutes a "culpable state of mind" under this prong of the constitutional analysis is dependent upon what harm is alleged. *Jones v. Goord*, 435 F. Supp. 2d 331, 235 (S.D.N.Y. 2006). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety, the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Chance v. Armstrong*, 143 F. 3d 98, 701 (2 d

Cir. 1998) *quoting Farmer,* 511 U.S. at 837.  In matters involving conditions of confinement, the "deliberate indifference" standard is applicable. *Id. citing Wilson,* 501 U.S. at 303; *see also Hathaway v. Coughlin,* 99 F. 3d 550, 553 (2d Cir. 1996)(inmate must show that prison officials acted with "a sufficiently culpable state of mind.").

In order to properly allege that a defendant in §1983 action violated an inmates constitutional rights, the plaintiff must allege that the defendant was specifically aware of the inmate's particular conditions of confinement and that such specific conditions posed "an excessive risk" to the inmate's health and safety and that the defendant disregarded that excessive risk. *Flynn v. Wright, et al.,* 2007 U.S. Dist. LEXIS 69422, at *6 (March 23, 2007) *citing Williams v. Fisher,* 2003 U.S. Dist. LEXIS 16442, 2003 WL 22170610, at *9 (S.D.N.Y. Sept. 18, 2003) (failure to allege knowledge of a specific condition placing the plaintiff at excessive risk to his or her health and safety insufficient to state a claim for deliberate indifference). Reliance on an official's alleged knowledge of general prison conditions does not satisfy the deliberate indifference pleading requirement as a plaintiff must allege facts that the defendant was aware of a specific risk or condition that would constitute an excessive risk to the inmate's health and safety and disregard that risk. *Melo v. Combes,* 1998 U.S. Dist. LEXIS 1793, at *14, 1998 WL 67667 (S.D.N.Y Feb 18, 1998).

Plaintiff's claims that arose while he was convicted prisoner must be analyzed under the Eighth Amendment. *Helling,* 509 U.S. at 31.

## 2. Fourteenth Amendment Requirements

Unlike prisoners, pretrial detainees' constitutional rights are analyzed under the due process clause of the Fourteenth Amendment. *Benjamin v. Fraser ("Benjamin II"),* 343 F.3d 35, 49 (2d Cir. 2003). Detainees must not be subjected to punishment "prior to an adjudication

of guilt or innocence in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). However, "[b]ecause restraint is always necessary in effectuating confinement, not every uncomfortable or disabling condition and restriction can be considered punitive." *Benjamin II*, 343 F.3d at 50. Although detainees rights are analyzed under the Fourteenth Amendment, courts utilize a "modified" Eighth Amendment deliberate indifference standard to apply claims brought by pretrial detainees challenging jail conditions. *Iqbal v. Hasty*, 490 F.3d 143, 169 (2d Cir. 2007); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000). To show violations Fourteenth Amendment violations regarding jail conditions, a detainee must meet a two-prong test. First, he must show that the deprivation is "sufficiently serious" or that there exists a "substantial risk of serious harm." *See Farmer*, 511 U.S. at 834; *see also Cuoco*, 222 F.3d at 106. He must also show that defendants acted with deliberate indifference by demonstrating an absence of reasonable care. *Benjamin II*, 343 F.3d at 50. Here, as discussed below, plaintiff has failed to state constitutional claims under the both the Fourteenth or Eighth Amendment for the alleged inadequate conditions of his confinement.

### 3.    Overcrowding

The overall theme of the Complaint is that as a result of overcrowding, plaintiff was subjected to substandard living conditions and denied various services and opportunities to which he asserts he was entitled both as a pretrial detainee and a sentenced inmate. *See generally* Compl.

Overcrowding and inadequate conditions of confinement resulting from overcrowding, as alleged by plaintiff, are "properly the subject of an Eighth Amendment claim only if the plaintiff can show that overcrowding caused the infliction of cruel and unusual punishment against him personally." *Coronado v. Goord*, No. 99 Civ. 1674, 2000 U.S. Dist.

LEXIS 13876, at *18 (S.D.N.Y. Sept. 26, 2000) (*citing Rhodes*, 452 U.S. at 348). "It is a rare case when a plaintiff can make out a claim that his injuries were caused by overcrowding." *Id.* at *19-20 (citations omitted). Just because a jail is overcrowded and an inmate suffers an injury or is placed at risk of injury does not mean that the risk is a result of overcrowding. *Id.* (quoting *Rhodes*, 452 U.S. at 348; 18 U.S.C. § 3626(a)(1)) ("A Federal court shall not hold prison or jail crowding unconstitutional under the eighth amendment except to the extent that an individual plaintiff inmate proves that the crowding causes the infliction of cruel and unusual punishment of that inmate.").

The test for whether overcrowding violates the Fourteenth Amendment is similar to the Eighth Amendment. The Second Circuit has established a "stringent test for determining when overcrowding will amount to punishment" and therefore, rise to the level of a constitutional violation. *Laureau v. Manson*, 651 F. 2d 96, 103 (2d Cir. 1981). In *Larueau*, the court held that to demonstrate such a violation, "it must be shown that the overcrowding subjects a detainee over an extended period of time to genuine privation and hardships not reasonably related to a legitimate governmental objective. *Id.* There must also be a causal connection alleged between the harm suffered by the detainee and overcrowding. *See Lewis v. Washington, et al.*, 1996 U.S. Dist. LEXIS 18173, *9 (S.D.N.Y. Dec. 9, 1996).

Here, set forth more fully below in Sections 4 through 11, plaintiff makes numerous conclusory allegations that the overcrowding led to unconstitutional conditions of confinement by pointing to a laundry list of unpleasant conditions to which the plaintiff was allegedly subjected. These conditions, however unpleasant, even when viewed in the "totality of the circumstances," do not violate the Constitution. Furthermore, plaintiff has failed to allege

facts sufficient to show that the individually named defendants acted with deliberate indifference to his health and safety.

4.    **Inadequate Sleeping Space**

Plaintiff alleges that as a result of overcrowding at the OBCC, he was denied sufficient bed space in violation of § 1-05 of the New York City Board of Corrections Minimum Standards ("Minimum Standards"). Compl. ¶ 16.   Specifically, he alleges that his bed was "placed less than arms-length away from the sleeping space" of the inmates around him. *Id.*

There is no constitutional right to a particular amount of bed space. *See Benjamin II,* 343 F. 3d at 53.  In *Benjamin II,* the Second Circuit explicitly rejected the District Court's finding that Riker's Island must provide at least 6 feet of space between sleeping inmates' heads to meet constitutional requirements.   The Court, in relevant part, held that "there is no constitutional requirement that pretrial detainees have six feet of breathing room." *Id.*   The Court also stated that in order to establish a constitutional violation resulting from inmates sleeping too closely to one another, the inmates would have to demonstrate an "actual or imminent substantial harm." *Id. (citing Lewis v. Casey,* 518 U.S. 343, 350 (1996)).

Here, plaintiff pleads no facts that show that the sleeping area bed spacing created a "substantial risk of serious harm" to himself. *Farmer,* 511 U.S. at 834.  Additionally, he was only subjected to these alleged conditions for slightly less than two months when at the OBCC. *See* Compl., ¶ 5.  Such temporary conditions are not "sufficiently serious" to rise to the level of a constitutional violation.  Plaintiff has also not alleged that as a result of these conditions he suffered an actual substantial harm.   Further, plaintiff is no longer incarcerated at the OBCC and thus, cannot show that he is "at imminent risk" of any injury as a result of these conditions. *See* Compl., ¶5.  Thus, he cannot meet the first prong of the deliberate indifference standard

- 10 -

required in *Benjamin* to establish a constitutional violation for inadequate bed space. *See*
*Benjamin*, 343 F. 3d at 53.

Moreover, plaintiff's allegations that defendants acted with deliberate
indifference in regards to the amount of sleeping space that he was afforded are merely
conclusory and lack the specificity of pleading required, even in light of notice pleading rules
under Fed. Civ. P. 8, to establish a claim for the second prong of an Eighth Amendment claim.
*See* Point III.A.1.b. at p. 7. Specifically, plaintiffs alleges no specific facts establishing that the
individually named defendants were involved in or aware of the alleged conditions, that they
were aware of an excessive risk to his health and safety and that they disregarded this risk.
Rather, plaintiff, in relevant part, makes only conclusory allegations against the individually
named defendants. *See* Compl., ¶¶ 44-48. None of these or any of the other allegations in the
Amended Complaint identify facts sufficient to establish that any of the individual defendants
were aware of plaintiff's specific conditions of care, that such conditions posed an "excessive
risk" of harm to his health and safety, and that they disregarded this risk.

Finally, as discussed above, under Point II, plaintiff has also failed to allege that
he suffered a physical injury as a result of inadequate bed space. *See id.* Consequently, he has
failed to state a constitutional claim for which relief can be granted for his claims about
inadequate bed space and thus, this claim must be dismissed.

### Section 1-05 of the City of New York Board of Correction Minimum Standards for New York City Correctional Facilities

Plaintiff also alleges the inadequate bed space violated the § 1-05 of the City of
New York Board of Correction Minimum Standards for New York City Correctional Facilities
("Minimum Standards"). Compl. at ¶16. Even construing plaintiff's allegations as true,
however, these conditions violated § 1-05 of the Minimum Standards, these standards are not

enforceable in federal court. *See Handberry v. Thompson*, 446 F. 3d 335, 344-46 (2d Cir. 2006)(The PLRA limits federal court relief to federal claims). Furthermore, a violation of these Standards is not *per se* a constitutional violation, as a plaintiffs must show that the violation of these standards meets the two prong deliberate indifference test described above to constitute a constitutional violation. Thus, these claims must be dismissed.

**5.    Toiletries**

Plaintiff alleges that he did not receive sufficient health and hygiene supplies "such as toothpaste, soap, detergent, and toilet paper" while at the OBCC and the EMTC. Compl. ¶¶ 17, 24. He alleges that the OBCC regularly distributed supplies intended for 30 people to the plaintiff's 60-person dorm. *Id.* ¶ *17*. Temporary deprivations of toiletries do not violate the Constitution. *See Trammell v. Keane*, 338 F. 3d 155, 165 (2d Cir. 2003) (deprivation of "toiletries for approximately two weeks—while perhaps uncomfortable—does not pose such an obvious risk to inmate's health and safety that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they drew] the inference.'") (*quoting Farmer*, 511 U.S. at 837).

Because plaintiff has not alleged that the reduced supply of toiletries caused him to go without them for an extended period of time, he has failed to show that his deprivation was "sufficiently serious" for his conditions of confinement to violate the Eighth and Fourteenth Amendments. He has also failed to allege facts sufficient to establish that defendants acted with deliberate indifference in depriving him of personal hygiene supplies. *See* Point III.A..1.b. at p. 7.

**6.    Laundry Services**

Plaintiff alleges that he sometimes had to use bath soap to launder his clothing. He also alleges that he "regularly wore the same jumper" for two weeks because EMTC did not have enough jumpers that were large enough to fit him.[3] Compl. ¶ 24. Courts in this jurisdiction have held that there is no constitutional violation where "inmates are provided the opportunity and the supplies to wash their clothes." *Lunney v. Brureton*, No. 04 Civ. 2438, 2007 U.S. Dist. LEXIS 38660, at *46 (S.D.N.Y. May 25, 2007). Plaintiff does not allege that he was unable to wash his clothes; he merely alleges that he sometimes had to wash his clothes with bar soap. Compl., ¶ 24. Plaintiff therefore has not alleged a "sufficiently serious" deprivation and has therefore not pled the first prong of the deliberate indifference test. Similarly, plaintiff's complaint that he had to wear his jumper for two-week periods is also not "sufficiently serious" to state a constitutional violation, as this condition was only temporary. *See Lunney*, 2007 U.S. Dist. LEXIS 38660, at *46.

Additionally, plaintiff has not adequately alleged facts that any defendant acted with a culpable state of mind or with an absence of due care under the second prong of the deliberate indifference test. (*See* Point III.A.1.b at p. 7), or that he sustained a physical injury as a result of these alleged deprivations. Plaintiff's claims should therefore, be dismissed.

### 7. Plaintiff Housed with Inmate Who Tested Positive for Tuberculosis

Plaintiff alleges that at the OBCC, a facility for detainees, he was housed with an inmate who tested positive for TB and that this placement "pos[ed] a direct threat to the health and safety of the inmates" in the plaintiff's housing unit. Compl. ¶ 20. To state a claim for constitutional violations resulting from exposure to communicable diseases, while an inmate

---

[3] Plaintiff alleges that this lack of clean clothing violated § 1-04 of the Minimum Standards. The Minimum Standards are not enforceable in federal court and does not *per se* violate the Constitution as a plaintiff must meet the two-prong test of the deliberate indifference standard described above in Section Point III.A.1.b at p. 7 to make a claim for a constitutional violation under the 14th and 8th Amendments. *See* Point III.A..4 at pp 11-12.

need not allege an actual injury, he must allege a "substantial risk of serious harm" such that the exposure "posed an unreasonable risk of serious damage to his future health." *Helling*, 509 U.S. at 33. It must also be alleged that the disease or exposure is so serious "that to ignore the condition would violate contemporary standards of decency." *Id.*; *see also Wise, et al. v. Chassin, et al.*, 1997 U.S. Dist. LEXIS 20496, *7-8 (S.D.N.Y. Dec. 2, 1997). In *Wise*, inmates exposed to TB who later contracted latent TB brought an action against prisoner administrators for constitutional violations. The Court held that, even though plaintiffs had alleged that they had to share air with inmates with TB, the plaintiffs did not aver any facts that the guidelines for handling inmates with TB were not followed. *Id.* at *12.

Plaintiff's allegations here are insufficient to establish a constitutional violation. First, except for the TB to which plaintiff alleges he was exposed, plaintiff has failed to allege that he was exposed to any other diseases as a result of the is alleged condition of confinement or whether the diseases were so serious that the failure to prevent such exposure "would violate contemporary standards of decency", or that the exposure posed an unreasonable risk of serious damage to his future health.

In regards to his allegation that he was exposed to an inmate who had "tested positive" for TB, this claim to is insufficient to amount to a constitutional violation. The fact that an inmate tests positive for TB and is housed with others, alone, is not enough to meet the "sufficiently serious" prong of the deliberate indifference test. *Bolton v. Goord*, 992 F. Supp. 604, 628 (S.D.NY. 1998)(failure to exclude inmates who have tested positive for TB from double bunking does not present a sufficiently serious injury). In order to adequately plead a claim about such exposure, plaintiff must have alleged a "substantial risk of serious harm" such

that the exposure to the inmate who tested positive for TB "posed an unreasonable risk of serious damage to his future health." *Helling*, 590 U.S. at 33.

Plaintiff has also not alleged facts sufficient to demonstrate that defendants acted with a culpable state of mind. Specifically, plaintiff has not alleged that defendants were aware that the inmate who tested positive for TB was housed in plaintiff's living area, that plaintiff suffered serious harm or an excessive risk of harm due to this alleged exposure, and that defendants disregarded this harm or risk. Plaintiff's generalized allegations are insufficient to meet pleading requirements to allege deliberate indifference. *See* Point III.A.1.b at p. 7.

### 8.    Plaintiff Hit by Tray in Mess Hall

Plaintiff alleges that another inmate threw a tray at him in the EMTC mess hall as a result of "overcrowded and under-monitored conditions at EMTC," (Compl. ¶ 23), and occurred because EMTC only had three phones for the use of 60 inmates. *Id.* Inmates deprived adequate protection from harm by other inmates may have a constitutional claim if they can demonstrate deliberate indifference on the part of the correctional facility defendants. *See Farmer*, 511 U.S. at 834; *see also Coronado*, 2000 U.S. Dist. LEXIS at * 8. A prisoner must allege harm that is objectively "sufficiently serious" and the plaintiff must also allege facts sufficient to demonstrate that defendants acted with a culpable state of mind. *Id., see also* Point III.A.1.b at p. 7. "It is not, however, every injury suffered by one prisoner at the hands of another that translate into constitutional liability for prison officials responsible for the victim's safety." Farmer 541 U.S. at 834.

Here, plaintiff only alleges that a fellow inmate became angry after an earlier verbal altercation and threw a tray at him. He does not allege that any defendant was deliberately indifferent or involved in any way as he does not allege that defendants were aware

of a specific risk of harm to him by the inmate who assaulted him and disregarded such a risk. *See* Point III.A.1.b. at p. 7. He also does not allege that he suffered any injury as a result of the incident. Simply because he was involved in a verbal altercation which later resulted in another inmate throwing a tray at him is insufficient to show that the incident is not sufficient to establish a constitutional violation. Finally, because he alleges no injury in fact, he has no standing to assert this claim.

9. **Exercise, Recreation, Law Library, Sick Call, Commissary, Meals and Services in the CPSU**

Plaintiff alleges that due to overcrowding, he was denied opportunities for exercise, recreation, and going to the law library because these activities were "often offered" at the same time. Compl. ¶ 19. He states that this scheduling practice violates §§ 1-07 and 1-09 of the Minimums Standards.[4] *Id.* He claims that he did not go to the prison yard when he was in CPSU because he feared the gang members who allegedly controlled the yard. *Id.* ¶ 31. He also claims that sick call was crowded during the day and that he instead would go at night. *Id.* ¶ 28. Finally, plaintiff claims that while he received services in his cell while in the CPSU, that there were "several occasions" when these services were unavailable. *Id.* ¶ 30.

a. **Exercise and Recreation**

Inmates have a right to some opportunity for exercise, *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985), but do not have a constitutional right to recreation. *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 213 (N.D.N.Y. 2001) ("it is not the right to recreation, but, rather, the right to exercise that the Eight Amendment protects") (*citing French v. Owens*, 777

---

[4] Nothing in the Minimum Standards prohibits more than one activity from being scheduled at the same time. *See* Minimum Standards, §§ 1-07, 1-09, attached hereto as Appendix II. Even if the Minimum Standards, however, did have such a prohibition, such a violation would not necessarily violate the constitution as a violation of these standards does not alone rise to the level of a constitutional claim. To show a constitutional violation, a plaintiff must meet the two prong deliberate indifference test described above in this Section, which for the reasons discussed herein, plaintiff has failed to do. Moreover, compliance with the Minimum Standards is not enforceable in federal court. *See* Point III.A.1.b at p. 7, above.

F.2d 1250, 1255 (7th Cir. 1985)).  In examining whether an inmate's constitutional rights have been violated, a review of the inmate's "availability of exercise is a key ingredient of a court's analysis." *Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996).  Temporary deprivations of exercise are not unconstitutional. *See Anderson*, 757 F. 2d at 36. Here, plaintiff's allegations do not satisfy either prong of the deliberate indifference test to state a constitutional claim under the Fourteenth or Eighth Amendments. First, since there is no constitutional right to recreation, plaintiff's claims in regards to opportunities for recreation must be dismissed.

Plaintiff's claim that he was unable to have opportunities for exercise because such opportunities conflicted with other activities is also not sufficient to state a constitutional claim.    Plaintiff has not alleged facts sufficient to state a claim that this deprivation was sufficiently serious and that as a result, plaintiff was deprived "the minimal civilized measure of life's necessities or that suffered harm or a risk of harm to his health and safety.  Furthermore, as plaintiff has acknowledged in his Amended Complaint, he was allowed to exercise at the OBCC, the EMTC and the CPSU, if he chose to do so. *See id.*, ¶¶ 26, 31 .  The times that he did not go were because he selected another activity or made a choice not to go for exercise. *See id.*

Plaintiff also has not alleged facts sufficient to demonstrate that defendants acted with a culpable state of mind  or with the absence of due care in regards to this alleged denial. *See* Point III.A.1.b. at p. 7.  He has not alleged any facts indicating that defendants were aware of plaintiff's access to exercise, that consequently there was a excessive risk of harm to plaintiff's health and safety, and that they disregarded that specific serious harm or risk of harm. Thus, this claim should be dismissed.

### b.    Law Library

Inmates have a constitutional right to reasonable and meaningful access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 821, 824-25 (1977). In order to properly allege a claim for a violation of the right to access to the courts, which includes access to a law library, a plaintiff must show: 1) deliberate indifference by jail personnel to this right; and 2) an actual ensuing injury. *Stanislas v. Tolson*, No. 00 Civ. 5419, 2002 U.S. Dist. LEXIS 10733, at * 4-5 (E.D.N.Y. March 19, 2002). Specifically, an inmate must allege that he or she was prevented from pursuing a legal action as a result of inadequate access to the law library and/or the courts. *Lewis v. Casey*, 518 U.S. 343 (1996); *see also McCoy*, 255 F. Supp. 2d at 260-61. "[A] delay in being able to work on one's own legal action or communicate with the court does not rise to the level of a constitutional violation." *Herrera v. Scully*, 815 F. Supp. 713, 725 (S.D.N.Y. 1993).

Here, plaintiff has not adequately alleged a constitutional claim for denial of access to the law library as he has not alleged that he suffered an actual injury as a result of allegedly being denied access to the law library, including facts that he was denied the ability to pursue a claim as a result of this deprivation as required by *Lewis*. Plaintiff has also failed to allege sufficient facts that to meet the pleading requirements of both the objective "sufficiently serious" prong and the subjective culpability prong of the deliberate indifferent standard. *See* Point III.A.1.b at p. 7. Thus, all of his law library claims must be dismissed.

### c.     Sick Call, Meals & Commissary

Plaintiff has also failed to state a constitutional claim in regards to his allegation that he had to choose between going to sick call and taking part in other activities while at the OBCC. Compl., ¶ 19. Plaintiff has not alleged that he was denied the ability to go to sick call or that he suffered any physical injury or any other injury from not being allowed to go to sick call. *See* Point II at pp. 4-5. He has also failed alleged sufficient facts that the defendants acted with

a culpable state of mind or with an absence of due care in regards to this claim. *See* Point III.A.1.b at p.7.

In addition, plaintiff alleges that there was insufficient number of doctors at the EMTC to treat all of the inmates at sick call. Compl., ¶ 28. He further alleges that because sick call was so crowded during the day, he would try to go to sick call during the evening hours but even then "he would not return to his dormitory until the middle of night." *Id.*  Plaintiff does not, however, allege that he was prohibited from going to sick call or that he was denied medical care or that such care was untimely, or that he suffered a physical injury because he could not go to sick call during the day. *See id.*  Therefore, plaintiff has failed to plead facts sufficient to demonstrate an objectively sufficiently serious harm.  Furthermore, plaintiff has not alleged facts that show that defendants acted with a culpable state of mind, as required to allege a constitutional violation.  These claims should, therefore, be dismissed.

Plaintiff also claims that meals and commissary were "often" offered during the same time as the already-discussed activities.  However, he does not claim that he was prevented from eating or from purchasing commissary goods and pleads no facts that would establish that any of the defendants with a culpable state of mind in regards in to this claim.  Finally, he has not alleged any physical injury as a result of meals and commissary being allegedly at the time.  Thus these claims should also be dismissed.

**d.    CPSU**

Plaintiff alleges that, although he generally received services, such as going to the law library and sick call, in his cell while during the 30 days he was in the CPSU, (*see id.*, ¶¶ 5, 29), he did not receive services such as the ability to go to sick call and to go to the law library on "several occasions." *Id.*, 30.  Since plaintiff was only in the CPSU for approximately 30 days

and his alleged denial of these services was only occasional, such allegations are not objectively sufficiently serious to rise to the level of a constitutional violation *See Herrera*, 815 F. Supp. at 725. Furthermore, he has not alleged any injuries as a result of some times not being able to have law library services or sick call while in the CPSU. *See generally*, Compl. Plaintiff also fails to allege facts sufficient to show that the defendants acted with a culpable state of mind. *See* Point III.A.1.b at 7. Therefore these claims should be dismissed.

### 10.    Staffing and Off-Housing Unit Activities[5]

Plaintiff claims that, because of overcrowding and understaffing, he could not attend activities and Muslim religious services "on numerous occasions" because no correction officer was available to escort him. Compl. ¶ 27. These claims, however, do not rise to the level of constitutional violations. First, while an inmate might like to attend social services and other activities while incarcerated, the denial of the ability to attend such activities does not amount to a "sufficiently serious" deprivation or place the inmate at "substantial risk of serious harm." *See Rhodes,* 452 U.S at 348, *Beckford*, 151 F. Supp. 2d at 213. Furthermore, plaintiff has failed to allege facts sufficient to establish a culpable state of mind on the part of the defendants regarding this claim so as to satisfy the second prong of the deliberate indifference standard. *See* Point III. A.1.b at 7.

Similarly, plaintiff's claims in regards to his ability to attend Muslim services fail to state a constitutional violation. Although inmates have a right to have access to religious services, *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989), these rights are not absolute and must be balanced with the legitimate security needs of the institution. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). Jails officials have a compelling government interest, due to

---

[5] Plaintiff has not raised a claim under the First Amendment of the United States Constitution or under the Religious Land Use and Institutionalized Person Act, 42 U.S.C. §2000cc, in regards to his claim that he was denied the ability to attend Muslim services. Therefore, this claim will only be analyzed under the Eighth Amendment.

legitimate security interests, in restricting inmates' attendance at religious and social services when there are not enough corrections officers to provide the necessary escort and related services needed for inmates to attend such activities. *Muhammad v. City of New York Dept of Corr.*, 904 F. Supp. 161 (S.D.N.Y. 1995), *appeal dismissed*, 126 F.3d 119 (2d Cir. 1997).

Here, like in *Muhammad*, defendants have a compelling state interest in maintaining the security of the facilities at Riker's Island including, the OBCC and EMTC. Restrictions imposed on inmates in attending religious services when there were not sufficient numbers of correctional officers to escort them to such services, as discussed in *Muhammad*, are in furtherance of a compelling state interest and are reasonably related to a legitimate institutional security interest. Furthermore, plaintiff has failed to allege sufficient facts to establish a culpable state of mind on the part of the defendants in regards to this claim to satisfy the second prong of the deliberate indifference standard. See Point III. A.1.b at 7.

**11.    Unsanitary Conditions**

Plaintiff alleges that the OBCC amd EMTC were infested with mice, insects, and "other vermin". Compl. ¶¶ 18, 25. Plaintiff also alleges that this vermin sometimes ate food he had purchased at the Commissary. *Id.* ¶ 18. However, "[t]he mere presence of vermin in a prisoner's housing area does not constitute 'punishment' under the Eighth Amendment." *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) (plaintiff failed to state a claim where he alleged his cell was infested with roaches) (*citing Benjamin v. Fraser*, 161 F. Supp. 2d 151, 174 (S.D.N.Y 2001)).

Here, plaintiff's allegations of infestation in his living area does not rise to the level of a constitutional violation. Plaintiff has not alleged a deprivation that was sufficiently serious to meet the objective prong of the deliberate indifference test, *see McCoy*, 255 F. Supp.

2d at 260, and plaintiff has failed to allege any that he suffered an actual physical injury resulting from these alleged unsanitary conditions. Additionally, because plaintiff is no longer at EMTC or the OBCC he is not at risk of such future injury. He also has not alleged sufficient facts that defendants acted with a culpable state of mind. *See* Point III A.1.b at 7. This allegation fails to state a claim and should be dismissed.

**B.**    **Plaintiff Has Failed to Allege A Viable *Monell* Claim**

In order to state a § 1983 claim against a municipality, a plaintiff must allege that an unconstitutional act occurred pursuant to an official policy or custom. *Monell v. Dep't of Soc. Services of the City of New York*, 436 U.S. 658, 690-91 (1978). Local governments can only be sued directly under § 1983 for monetary, declaratory, or injunctive relief "where the action that is alleged to have violated federal law 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Comm. Health Care Ass'n v. DeParle*, 69 F. Supp. 2d 463, 474 (S.D.N.Y. 1999) (*quoting Monell*, 436 U.S. at 690). There must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation" such that the municipality can be faulted for the deprivation. *Caminero v. Rand*, 882 F. Supp. 1319, 1323 (S.D.N.Y. 1995) (*quoting City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). If a plaintiff cannot prove any set of facts to show an underlying constitutional violation, he cannot prove a claim of liability against a municipality under 42 U.S.C. § 1983. *See Zahra v. Town of Southerland*, 48 F.3d 674, 685 (2nd Cir. 1995) (to succeed on a §1983 claim against a municipality, plaintiff must prove denial of a constitutional right).

Here, because plaintiff has not pled sufficient facts demonstrating a constitutional violation and thus has failed to allege facts to sufficient to show municipal liability. *See Monell*, 436 U.S. at 694. The claims against New York City should be dismissed.

**POINT IV**

**CLAIMS AGAINST DEFENDANTS HORN, HOURIHANE, LANGSTON, AND DAVIS SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS NOT ALLEGED THEIR PERSONAL INVOLVEMENT IN THE INCIDENTS ALLEGED IN THE COMPLAINT**

It is well settled that in order to bring a § 1983 claim against an individual for civil rights violations for damages, a plaintiff must specifically allege personal involvement by the individual against whom such claims are being brought. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2nd Cir. 1995). The failure to specifically plead such allegations is fatal to the complaint. *See Finger v. McGinnis*, No. 99 Civ. 9870, 2004 U.S. Dist. LEXIS 11048, at *18 (S.D.N.Y. June 16, 2004). A theory of *respondeat superior* cannot form the basis of such liability. *Colon*, 58 F.3d at 873. Supervisory liability under § 1983 can only be shown in the following ways:

> (1) actual direct participation in the constitutional violation, (2) the failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned the conduct amounting to a constitutional violation or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

Here, plaintiff has not alleged that Horn, Hourihane, Langston, or Davis was personally involved in any of the incidents alleged in the Amended Complaint. *See generally* Compl. Plaintiff has also not alleged facts that any of these defendants were grossly negligent in supervising their subordinates or any facts that they personally failed to act on information that unconstitutional acts were occurring. Rather, plaintiff has made only conclusory allegations that these defendants' "policies, procedures, acts, and omissions with respect to overcrowding at

- 23 -

OBCC and EMTC deprived plaintiff of adequate shelter, reasonable safety, and basic human needs, and placed [him] at unreasonable risk of increased violence, illness, mental suffering, and deteriorating health" *Id.* ¶ 44. Plaintiff also makes conclusory allegations that "[d]efendants knew of and disregarded conditions posing an excessive risk to Plaintiff's health and safety," *id.* ¶ 44, and that their actions were intentional. *Id.* ¶ 47. These allegations, however, are inadequate because they are merely conclusory. *See* Point III.A.1.b. at p. 7. Defendants Horn, Hourihane, Langston, and Davis therefore cannot be liable for damages under § 1983. *See Renelique v. Doe*, No. 99 Civ. 10425, 2002 U.S. Dist. LEXIS 26980, at *14-16 (S.D.N.Y. Dec. 29, 2003). Thus, plaintiff's claims against all of the individually named defendants should be dismissed.

## POINT V

### PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR LACK OF STANDING

Plaintiff has raised numerous claims for which he lacks standing to bring. In order for a plaintiff to have standing to bring an action, the Supreme Court has held that:

> "the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992) (footnote, citations, and internal quotation marks omitted). . . . In light of these principles, we have repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power.

- 24 -

*United States v. Hayes*, 515 U.S. 737, 742 (1995) (citations omitted); *see also Lewis*, 518 U.S. at 349 (Supreme Court held  inmates challenging prison law library access must "have suffered, or will imminently suffer, actual harm" to have standing to bring claim).

Here, plaintiff's Complaint makes a number of conclusory allegations that do not satisfy these strict standing requirements as he has not alleged an "injury in fact" that is "concrete and particularized" and "actual or imminent," such as his claims in regards to the law library, sick call, the number of doctors available to treat sick inmates, among others. *See* Point III, above. Plaintiff's claims for which he lacks standing must be dismissed.

## CONCLUSION

**WHEREFORE**, defendants respectfully request that their motion to dismiss the Complaint be granted, that the Complaint be dismissed in its entirety, and that the request for relief be denied in all respects.

Dated:       New York, New York
             January 25 , 2008

                            **MICHAEL A. CARDOZO**
                            Corporation Counsel of the
                              City of New York
                            Attorney for Defendant
                            100 Church Street, Room 2-185
                            New York, New York 10007
                            (212) 788-0408
                            By: 

                                Deborah A. Dorfman
                                Assistant Corporation Counsel

TO:    Stroock, Stroock & Lavan, LLP, Attorneys for Plaintiff

# APPENDIX I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STANDISH DUBLIN

               Plaintiff,

     vs.

THE CITY OF NEW YORK, MARTIN F. HORN,
in his individual and official capacity as
Commissioner of the New York City Department of
Corrections, MICHAEL HOURIHANE in his
individual and official capacity as Warden of the Otis
Bantum Correctional Center, SANDRA
LANGSTON, in her individual and official capacity
as Warden of the Eric M. Taylor Center,
JOANDREA DAVIS, in her individual and official
capacity as Warden of the Eric M. Taylor Center,

               Defendants.

**AMENDED COMPLAINT**

Civil Action No. 07 Civ 4017 (RPP)

Plaintiff STANDISH DUBLIN, by and through his attorneys Stroock & Stroock & Lavan

LLP, alleges upon knowledge as to himself and upon information and belief as to all other

matters as follows:

## PRELIMINARY STATEMENT

    1.     Mr. Dublin files this action pursuant to 42 U.S.C. § 1983 seeking redress of

injuries he suffered while in the custody of the New York City Department of Correction (the

"DOC") for deprivation under color of state law of the rights, privileges and immunities secured

to him by the United States Constitution and in particular the Eighth and Fourteenth

Amendments thereof.

    2.     Specifically, Mr. Dublin challenges and seeks redress for various conditions and

circumstances of confinement at Rikers Island which fall below the standards of human decency,

inflict needless suffering and caused him to be deprived of adequate shelter, reasonable safety

and several of life's basic necessities

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as events giving rise to this action occurred within this District.

## PARTIES

5.      Mr. Dublin was confined in two separate facilities on Rikers Island between November 2006 and July 2007. From November 23, 2006 until approximately January 21, 2007, Mr. Dublin was confined in the "3 Lower" and "6 Lower" dormitory-style housing units at the Otis Bantum Correctional Center ("OBCC"), located at 16-00 Hazen Street, East Elmhurst, New York 11370. On or about January 21, 2007, Mr. Dublin was transferred to the Eric M. Taylor Center ("EMTC"), located at 10-10 Hazen Street, East Elmhurst, New York 11370, where he was confined until his release on or about July 24, 2007. Beginning on or about March 12, 2007, Mr. Dublin spent approximately 30 days in the isolation unit of EMTC, known as "CPSU."

6.      Defendant City of New York is a municipal corporation, which through its Department of Correction, operates a number of detention jails. The DOC, through its senior officials at the central office, in each facility, promulgated and implements policies. In addition, senior officials in the DOC are aware of and tolerate certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten DOC policies or customs. The Department is also responsible for the appointment, training, supervision and conduct of all DOC personnel, including the defendants referenced herein.

7.    Defendant Martin F. Horn is and was at all times relevant to this action, the Commissioner of the DOC. On information and belief, Defendant Horn, as Commissioner of the DOC, is responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and is responsible for the training, supervision, and conduct of all DOC personnel including the defendants referenced herein. Defendant Horn is and was at all relevant times responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel obey the laws of the United States and of the State of New York. He is sued in his official and individual capacities.

8.    Defendant Michael Hourihane was for all times relevant to this action, the Warden of OBCC. In that capacity Defendant Hourihane was ultimately responsible for the care, custody, and safe treatment of those inmates in OBCC. He is sued in his official and individual capacities.

9.    Defendant Sandra Langston was for a portion of the time relevant to this action, the Warden of EMTC. In that capacity, Defendant Langston was ultimately responsible for the care, custody, and safe treatment of those inmates in EMTC. She is sued in her official and individual capacities.

10.    Defendant Joandrea Davis is and was for a portion of the time relevant to this action, the Warden of EMTC. In that capacity, Defendant Davis was ultimately responsible for the care, custody, and safe treatment of those inmates in EMTC. She is sued in her official and individual capacities.

11.    At all relevant times herein, Defendants Horn, Hourihane, Langston, and Davis, were each a "person" for purposes of 42 U.S.C. §1983, and acted under color of law to deprive Mr. Dublin of his Constitutional rights, as set forth more fully below.

3

## FACTUAL ALLEGATIONS

**A.    The Conditions of Mr. Dublin's Confinement
Violated the Eighth Amendment**

12.    From the time that the first jail opened in New York City, overcrowding has been a recurring problem.

13.    According to the DOC, it now averages a daily inmate count of between 16,500 to 20,000. This number is greater than the entire state prison population of most states.

14.    Most of these inmates are housed on Rikers Island, where the facilities are overcrowded.

15.    When Mr. Dublin was admitted to the custody of the City of New York on November 23, 2006, he was a pretrial detainee. Mr. Dublin was placed in the dormitory-style housing unit, commonly known as "3 Lower" in OBCC. While in OBCC, he was also housed in the "6 Lower" housing unit. The conditions in 3 Lower and 6 Lower were in effect the same.

16.    While confined in OBCC, Mr. Dublin was forced to sleep in a bed placed less than arms-length away from the sleeping space of the persons directly adjacent to him, in violation of §1-05 of the City of New York's own minimum standards for overcrowding in correctional facilities. Upon information and belief, the City's failure to provide the mandated amount of sleeping space to inmates at OBCC was the result of overcrowding.

17.    Inmates in OBCC, including Mr. Dublin, were routinely deprived of basic hygiene items such as toothpaste, soap, detergent, and toilet paper because the facilities did not have adequate quantities to supply the number of inmates housed therein. Due to overcrowding, supplies that would accommodate 30 people were regularly sent to accommodate inmates in a 60-man dorm. These conditions directly led to increased stress levels, physical discomfort, medical risk and acts of aggression.

18.     There was also a pervasive infestation problem in OBCC during Mr. Dublin's confinement. There were mice and roaches virtually everywhere that Mr. Dublin went. The food that he and other inmates purchased from the commissary would be consumed by the mice and roaches. Overcrowding exacerbated these unsanitary conditions, which in turn made the overcrowding only more dangerous and inhumane.

19.     In OBCC, opportunities for activities outside Mr. Dublin's housing unit were limited, because activities such as law library were often offered to his overcrowded housing unit at the same time as other activities such as recreation, commissary, meals, sick call, etc. Upon information and belief, these scheduling practices, which violate §§ 1-07 and 1-09 of the City of New York's own minimum standards for correctional facilities, are the function of an over-taxed facility which does not have the space or the resources to accommodate all the inmates it is housing.

20.     Further, due to the overcrowded conditions on Rikers Island, the DOC is unable to provide adequate medical isolation of ill and infectious prisoners. On the contrary, inmates who have been designated as "Medically Isolated," or "MI" are mixed with the general population. For example, in or about January 2, 2007, an inmate who had tested positive for Tuberculosis was placed in Mr. Dublin's housing unit, posing a direct threat to the health and safety of the inmates in 6 Lower.

21.     On January 3, 2007, Mr. Dublin submitted a grievance concerning the DOC's failure to provide sick call to the members of housing unit, 6 Lower, who had been wrongfully exposed to the inmate with Tuberculosis by dropping a copy in the grievance box provided for that purpose. Mr. Dublin never received any response to his January 3, 2007 grievance.

22.     On or about January 21, 2007, Mr. Dublin was transferred to EMTC, a facility for sentenced inmates, where the overcrowded conditions were no better.

23.     Approximately one week after his transfer to EMTC, Mr. Dublin was the victim of inmate on inmate violence stemming from the overcrowded and under-monitored conditions at EMTC. While in the mess hall, an inmate threw a tray at Mr. Dublin, hitting him. Earlier that day, Mr. Dublin and that inmate had a verbal altercation about telephone use. EMTC had only 3 phones available for 60 inmates to use, which directly led to conflict and increased violence.

24.     Like in OBCC, EMTC had insufficient health and hygiene supplies for all the prisoners housed therein. Mr. Dublin regularly wore the same jumper for a two week period, because when new jumpers were distributed on a weekly basis the facility did not have enough jumpers large enough to fit Mr. Dublin. On many occasions, Mr. Dublin was forced to crush the remnants of bath soap he found in the shower bed in order to launder his clothing. Failing to provide inmates with clean clothing is in direct violation of §1-04 the City of New York's own minimum standards, which provide that inmates are to be provided with a clean change of clothing at least twice per week. Upon information and belief, the City could not meet these mandates due to overcrowding.

25.     EMTC was also infested with insects, mice, and other vermin, which served to worsen the effects of the overcrowding on the inmates.

26.     Like in OBCC, Mr. Dublin was often deprived of the opportunity for exercise, recreation, and law library because they were offered to his overcrowded housing unit at the same time as other activities such as commissary, meals, sick call, etc.

27.     Additionally, due to overcrowding and understaffing at EMTC, there were not enough officers available to escort the inmates to the various activities. As a result of these

6

conditions, Mr. Dublin was on numerous occasions, deprived of the opportunity to attend activities, or his time at such activities was cut so short as to be rendered useless. On numerous occasions, Mr. Dublin could not attend Muslim services because there was not an available corrections officer to escort him, or when he did arrive, the services were almost over.

28.    In EMTC, there were not enough doctors to treat all the inmates at sick call. If possible, Mr. Dublin would avoid going to sick call during the day because it was so crowded. Instead, he would try to go to sick call during the evening hours, but even then he would not return to his dormitory until the middle of night.

29.    On or about March 12, 2007, Mr. Dublin was transferred to the in solitary confinement unit of EMTC, known as "CPSU" for approximately 30 days.

30.    While in CPSU, Mr. Dublin encountered many of the same problems that plagued OBCC and the other areas of EMTC. There were inadequate amounts of health and hygiene supplies. For example, Mr. Dublin was forced to make a single, hotel-sized bar of soap last for his entire time in CPSU. Prison services such as sick call, and law library were also inadequate. Because of the restrictions of the CPSU unit, these services came to the inmates' cells. There were several occasions where Mr. Dublin wanted such services, but they were unavailable to him. On information and belief, these circumstances were the direct result of overcrowded conditions.

31.    Mr. Dublin was deprived of the meaningful opportunity for exercise and recreation while in CPSU because gang members controlled the yard. Mr. Dublin did not go to the yard, because he feared for his personal safety.

32.    The totality of the circumstances described above constitute a failure to provide Mr. Dublin with the basic necessities of life during his confinement. Overcrowding and its

effects, including inadequate clothing, shelter, sanitation, medical care and personal safety, have caused genuine deprivation and hardship over an extended period of time for Mr. Dublin. Such harsh conditions and restrictions are incompatible with contemporary standards of decency, cause wanton and unnecessary infliction of pain, and are not reasonably related to any legitimate penological objectives.

33.    As a result of the foregoing, Mr. Dublin was subjected to cruel and unusual punishment in violation of the Eighth Amendment.

**B.    The City of New York's Inmate Grievance Procedure**
**Was Not Available To Mr. Dublin**

34.    Special circumstances excuse Mr. Dublin's failure to grieve or fully exhaust his administrative remedies.

35.    Upon arrival at Rikers Island, Mr. Dublin did not receive an inmate handbook or a copy of the grievance procedures. During his entire eight months at Rikers Island, Mr. Dublin never saw a copy of the grievance procedures. He was not aware that the procedure involved a five-step process or that he could appeal his grievance to the next level if it was not decided within the allotted time frame.

36.    Grievance forms were not readily available to the inmates on Rikers Island. Mr. Dublin never submitted grievances on blank pieces of paper because he thought that they would be rejected.

37.    When Mr. Dublin was nevertheless able to submit grievances, while housed in OBCC, none were ever answered.

38.    While housed in EMTC, only one of Mr. Dublin's grievances was resolved. That grievance did not relate to the conditions of his confinement, but instead related to a monetary penalty assessed from Mr. Dublin's commissary account. With respect to many of Mr. Dublin's

other grievances, he was informed that the matters he complained of could not be rectified or could not be grieved. Although Mr. Dublin does not recall the specifics of these grievances, it is his recollection that they concerned the conditions of his confinement.

39.    Because of the lack of response to his grievances, Mr. Dublin reasonably believed that it was best to pursue solutions through other channels, such as speaking to deputies and captains. When Mr. Dublin sought the help of Captain Stook in OBCC and Captain Hart in EMTC, he was told that they would "look into it." He never received any response from these prison officials.

40.    Upon information and belief, it is an official, unwritten policy of the DOC to ignore most of the grievances it receives from the inmate population, so as to frustrate and impede the claims of unsophisticated parties such as Mr. Dublin.

41.    Upon information and belief, Defendants routinely deprive inmates of access to the grievance procedure, to stymie complaints regarding conditions of confinement and thereafter avail themselves of a non-exhaustion defense which further frustrates, if not stifles, inmates like Mr. Dublin from pursuing valid legal claims concerning the overcrowded conditions in OBCC and EMTC.

42.    This policy and practice rendered the grievance procedure unavailable to Mr. Dublin.

## COUNT I

### Violation of the Eighth and Fourteenth Amendments and 42 U.S.C. §1983 Against Defendants Horn, Hourihane, Langston and Davis

43.    Mr. Dublin repeats and realleges the foregoing paragraphs as if they were fully set forth herein.

44.    Defendants' policies, practices, acts, and omissions with respect to overcrowding at OBCC and EMTC deprived Plaintiff of adequate shelter, reasonable safety, and basic human needs, and placed Mr. Dublin at unreasonable risk of increased violence, illness, mental suffering, and deteriorating health.

45.    Defendants knew of and disregarded conditions posing an excessive risk to Plaintiff's health and safety, but failed to take necessary or appropriate action to rectify those conditions. Defendants were deliberately indifferent to the serious hardship inflicted on Mr. Dublin by the unconstitutional conditions of his confinement, and to the concomitant infringement of his rights.

46.    By reason of the foregoing, and by subjecting Mr. Dublin to overcrowding and its effects, Defendants deprived Plaintiff of rights, remedies, privileges, and immunities secured by 42 U.S.C. §1983, including, but not limited to, rights guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

47.    Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employments as DOC officers and employees. Defendants' acts, or failure to act, were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. Defendants acted willfully, knowingly, and with the specific intent to deprive Mr. Dublin of his constitutional rights secured by 42 U.S.C. §1983, and the Eighth and Fourteenth Amendment to the United States Constitution.

48.    As a direct and proximate result of the facts alleged, Mr. Dublin sustained physical, psychological and emotional injury.

## COUNT II

### Violation of the Eighth and Fourteenth Amendments and 42 U.S.C. §1983 Against Defendant City of New York

49.    Mr. Dublin repeats and realleges the foregoing paragraphs as if they were fully set forth herein.

50.    Defendant's policies, practices, acts, and omissions with respect to overcrowding at OBCC and EMTC deprived Plaintiff of adequate shelter, reasonable safety, and basic human needs, and placed Mr. Dublin at unreasonable risk of increased violence, illness, mental suffering, and deteriorating health.

51.    Defendant knew of and disregarded conditions posing an excessive risk to Plaintiff's health and safety, but failed to take necessary or appropriate action to rectify those conditions.

52.    Defendant City of New York, through the DOC, and acting under pretense and color of law, did permit, tolerate, and act with deliberate indifference to a pattern and practice of overcrowded conditions at Rikers Island. This widespread tolerance of overcrowding and its effects constitutes a municipal policy, practice, or custom, and led to Mr. Dublin's injuries.

53.    By permitting, tolerating, and sanctioning a persistent and widespread policy, practice and custom, which subjected Mr. Dublin to overcrowded conditions and its effects, Defendant City of New York has deprived him of rights, remedies, privileges, and immunities secured by 42 U.S.C. §1983, and the Eighth and Fourteenth Amendments to the United States Constitution.

54.    As a direct and proximate result of the facts alleged, Mr. Dublin sustained physical, psychological and emotional injury.

## JURY DEMAND

55.    Mr. Dublin demands a trial by jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Dublin respectfully prays for judgments against the Defendants as follows:

> (a) Awarding compensatory damages for violations of 42 U.S.C. §§ 1983;
>
> (b) Awarding reasonable attorneys' fees and costs of this action, pursuant to 42 U.S.C. §1988; and
>
> (c) Awarding such other relief as this Court may deem just and proper.

Dated:  New York, New York
         December 14, 2007

STROOCK & STROOCK & LAVAN LLP

By:    _____

James L. Bernard (JB-4273)
Kevin J. Curnin (KC-3561)
Ilana Cutler (IC-3378)
Michelle H. Schott (MS-1039)
180 Maiden Lane
New York, New York 10038-4982

*Attorneys for Plaintiff*

# APPENDIX II



*The City of New York*
*Board of Correction*

**MINIMUM STANDARDS FOR**
**NEW YORK CITY CORRECTIONAL FACILITIES**

CITY OF NEW YORK
MICHAEL R. BLOOMBERG, Mayor

(2) During the day for count or required institutional business that can only be carried out while prisoners are locked in, not to exceed two hours in any 24-hour period. This time may be extended if necessary to complete an off count

(3) Within 60 days of the effective date of this standard, the Department shall submit to the Board its list of institutions, if any, that require more than two hours of lock-in during the day because of unique problems Pursuant to Section 1-16, the Board shall determine if any variance from the requirement of Section 1-06 (b) (2) is necessary

## (c) Optional lock-in

(1) Prisoners shall have the option of being locked in their cells during lock-out periods Prisoners choosing to lock in at the beginning of a lock-out period of two hours or more, shall be locked out upon request after one-half of the period At this time, prisoners who have been locked out shall be locked in upon request

(2) The Department may deny optional lock-in to a prisoner in mental observation status if a psychiatrist or psychologist determines in writing that optional lock-in poses a serious threat to the safety of that prisoner. A decision to deny optional lock-in must be reviewed every ten days, including a written statement of findings, by a psychiatrist or psychologist Decisions made by a psychiatrist or psychologist pursuant to this Section must be based on personal consultation with the prisoner

## (d) Schedule

Each institution shall maintain and distribute to all prisoners or post in each housing area its lock-out schedule, including the time during each lock-out period when prisoners may exercise the options provided by Section 1-06(c)

# SECTION 1-07 RECREATION

## (a) Policy

Prisoners shall be provided with adequate indoor and outdoor recreational opportunities

## (b) Recreation Areas

By September 1, 1978, indoor and outdoor recreation areas of sufficient size to meet the requirements of this part shall be established and

maintained by each institution. An outdoor recreation area must allow for direct access to sunlight and air

## (c) Recreation Schedule

Recreation periods shall be at least one hour; only time spent at the recreation area shall count toward the hour Recreation shall be available five days per week in the outdoor recreation area, except in inclement weather when the indoor recreation area shall be utilized By September 1, 1978, such recreation shall be available daily

## (d) Recreational Equipment

The Department shall make available to prisoners an adequate amount of equipment during the recreation period. A list of the equipment available at each institution shall be submitted to the Board within 30 days of the effective date of this standard

## (e) Recreation Within Housing Area

(1) Prisoners shall be permitted to engage in recreation activities within cell corridors and tiers, dayrooms and individual housing units. Such recreation may include but is not limited to:

    (i) table games;

    (ii) exercise programs; and

    (iii) arts and crafts activities

(2) Recreation taking place within cell corridors and tiers, dayrooms and individual housing units shall supplement, but not fulfill, the requirements of Section 1-07 (c)

## (f) Recreation for Prisoners in Segregation

Prisoners confined in administrative or punitive segregation shall be permitted recreation in accordance with Section 1-07 (c)

# SECTION 1-08 RELIGION

## (a) Policy

Prisoners have an unrestricted right to hold any religious belief, and to be a member of any religious group or organization, as well as to refrain from the exercise of any religious beliefs. A prisoner may change his or her religious affiliation

## (b) Exercise of Religious Beliefs

(1) Prisoners are entitled to exercise their religious beliefs in any manner that does not constitute a clear and present danger to the safety or security of an institution

(2) No employee or agent of the Department or of any voluntary program shall be permitted to proselytize or seek to convert any

(6) In determining requests made pursuant to paragraph (3) of this subdivision, prisoners shall be permitted to present evidence indicating a religious foundation for the belief

(7) The procedure outlined in Sections 1-08(i) (1) and 1-08 (j) (3) shall apply when a prisoner request made pursuant to Section 1-08 (i) (3) is denied

**(j) Limitations on the Exercise of Religious Beliefs**

(1) Any determination to limit the exercise of the religious beliefs of any prisoner shall be made in writing and shall state the specific facts and reasons underlying such determination A copy of this determination, including the appeal procedure, shall be sent to the Board and to any person affected by the determination within 24 hours of the determination

(2) This determination must be based on specific acts committed by the prisoner during the exercise of his or her religion that demonstrate a serious and immediate threat to the safety and security of the institution Prior to any determination, the prisoner must be provided with written notification of the specific charges and the names and statements of the charging parties, and be afforded an opportunity to respond

(3) Any person affected by a determination made pursuant to this subdivision may appeal such determination to the Board

(i) The person affected by the determination shall give notice in writing to the Board and the Department of his or her intent to appeal the determination

(ii) The Department and any person affected by the determination may submit to the Board for its consideration any relevant material in addition to the written determination

(iii) The Board or its designate shall issue a written decision upon the appeal within 14 business days after it has received notice of the requested review

## SECTION 1-09 ACCESS TO COURTS

**(a) Policy**
Prisoners are entitled to access to courts, attorneys, legal assistants and legal materials

**(b) Judicial and Administrative Proceedings**
(1) Prisoners shall not be restricted in their communications with courts or administrative agencies pertaining to either criminal or civil proceedings

14

(2) Timely transportation shall be provided to prisoners scheduled to appear before courts or administrative agencies Vehicles used to transport prisoners must meet all applicable safety and inspection requirements and provide adequate ventilation, lighting and comfort

**(c) Access to Counsel**

(1) Prisoners shall not be restricted in their communication with attorneys. The fact that a prisoner is represented by one attorney shall not be grounds for preventing him or her from communicating with other attorneys Any properly identified attorney may visit any prisoner with the prisoner's consent

(i) An attorney may be required to present identification to a designated official at the central office of the Department in order to obtain an institutional pass This pass shall remain in effect for a minimum of three years and shall permit the attorney to visit any prisoner under the custody of the Department.

(ii) The Department may only require such identification that is normally possessed by an attorney

(2) The Department may limit visits to any attorney of record or an attorney with a court notice for prisoners undergoing examination for competency pursuant to court order

(3) Visits between prisoners and attorneys shall be kept confidential and protected, in accordance with provisions of Section 1-10 Legal visits shall be permitted at least eight hours per day between 8 am and 8 pm During business days, four of those hours shall be 8 am to 10 am, and 6 pm to 8 pm The Department shall maintain and post the schedule of legal visiting hours at each institution

(4) Mail between prisoners and attorneys shall not be delayed, read, or interfered with in any manner, except as provided in Section 1-12

(5) Telephone communications between prisoners and attorneys shall be kept confidential and protected, in accordance with the provisions of Section 1-11

**(d) Access to Co-defendants**
Upon reasonable request, regular visits shall be permitted between a detainee and all of his or her co-defendants who consent to such visits. If any of the co-defendants are incarcerated, the Department may require that an attorney of record be present.

15

(e) Attorney Assistants

(1) Law students, legal paraprofessionals, and other attorney assistants working under the supervision of an attorney representing a prisoner shall be permitted to communicate with prisoners by mail, telephone and personal visits, to the same extent and under the same conditions that the attorney may do so for the purpose of representing the prisoner Law students, legal paraprofessionals and other attorney assistants working under the supervision of an attorney contacted by prisoner shall be permitted to communicate with that prisoner by mail, telephone, or personal visits to the same extent and under the same conditions that the attorney may do so

(2) An attorney assistant may be required to present a letter of identification from the attorney to a designated official at the central office of the Department in order to obtain an institutional pass. A pass shall not be denied based upon any of the items listed in Section 1-10 (h) (1)

(3) The pass shall remain in effect for a minimum of one year and shall permit the assistant to perform the functions listed in Section 1-09 (e) it may be revoked if specific acts committed by the legal assistant demonstrate his or her threat to the safety and security of an institution This determination must be made pursuant to the procedural requirements of Section 1-10 (h) (2), 1-10 (h) (4) and 1-10 (h) (5)

(f) Law Libraries

Each institution shall maintain a properly equipped and staffed law library

(1) The law library shall be located in a separate area sufficiently free of noise and activity and with sufficient space and lighting to permit sustained research

(2) Each law library shall be open for a minimum of five days per week including at least one weekend day In facilities with more than 600 prisoners, each law library shall be open for a minimum often hours during lock-out hours, on days of operation In facilities with 600 or fewer prisoners, each law library shall be open for a minimum of eight and a half hours during lock-out hours, on days of operation In all facilities, the law library shall be open on all days of operation for at least three hours between 6 pm and 10 pm The law library will be kept open for prisoners use on all holidays which fall on regular law library days except:
New Year's Day
July 4th
Thanksgiving
Christmas

The law library may be closed on holidays other than those specified provided that law library services are provided on either of the two days of the same week the law library is usually closed On holidays on which the law library is kept open, it shall operate for a minimum of eight hours No changes to law library schedules in effect on January 1, 1986, shall be made without written notice to the Board of Correction, which must be received at least five business days before the planned change(s) is to be implemented

(3) The law library schedule shall be arranged to provide access to prisoners during times of the day when other activities such as recreation, commissary, meals, school, sick call, etc are not scheduled Where such considerations cannot be made, prisoners shall be afforded another opportunity to attend the law library at a later time during the day

(4) Each prisoner shall be granted access to the law library for a period of at least two hours per day each day the law library is open. Upon request, extra time may be provided as needed, space and time permitting. In providing extra time, prisoners on trial and those with an impending court deadline, shall be granted preference

(5) The law library hours for prisoners in punitive segregation may be reduced or eliminated, provided that an alternative method of access to legal materials is instituted to permit effective legal research

(6) Legal research classes for general population prisoners shall be conducted at each facility on at least a quarterly basis Legal research training materials shall be made available upon request to prisoners in special housing

(7) The Department shall periodically report to the Board detailing the resources available at the law library at each institution, including a list of titles and dates of all law books and periodicals and the number, qualifications and hours of English and Spanish-speaking legal assistants

(g) Legal Documents and Supplies

(1) Each law library shall contain necessary research and reference materials, which shall be kept properly updated and supplemented, and shall be replaced without undue delay when materials are missing or damaged

(2) Prisoners shall have reasonable access to typewriters and photocopiers for the purpose of preparing legal documents A sufficient number of operable typewriters and a photocopy machine will be provided for prisoner use

(3) Legal clerical supplies, including pens, legal paper and pads and carbon paper shall be made available for purchase by prisoners. Such legal clerical supplies shall be provided to indigent prisoners at Department expense.

(4) Unmarked legal forms which are commonly used by prisoners shall be made available. Each prisoner shall be permitted to use or make copies of such forms for his or her own use.

(h) Law Library Staffing

(1) During all hours of operation, each law library shall be staffed with trained civilian legal coordinator(s) to assist prisoners with the preparation of legal materials Legal coordinator coverage shall be provided during extended absences of the regularly assigned legal coordinator(s)

(2) Each law library shall be staffed with an adequate number of permanently assigned correction officers knowledgeable to law library procedures

(3) Spanish speaking prisoners shall be provided assistance in use of the law library by employees fluent in the Spanish language on an as needed basis

(i) Number of Legal Documents and Research Materials

(1) Prisoners shall be permitted to purchase and receive an unrestricted number of law books and other legal research materials from any source

(2) Reasonable regulations governing the keeping of materials in cell and the searching of cells may be adopted, but under no circumstances may prisoners legal documents, books, and papers be read or confiscated by correctional personnel without a lawful warrant Where the space in a cell is limited, an alternative method of safely storing legal materials elsewhere in the institution is required, provided that a prisoner shall have regular access to these materials

(j) Limitation of Access to Law Library

(1) A prisoner may be removed from the law library if he or she disrupts the orderly functioning of the law library or does not use the law library for its intended purposes A prisoner may be excluded from the law library for more than the remainder of one law library period only for a disciplinary infraction occurring within a law library

(2) Any determination to limit a prisoner's right of access to the law library shall be made in writing and shall state the specific facts and reasons underlying such determination A copy of this

determination, including the appeal procedure, shall be sent to the Board and to any person affected by the determination within 24 hours of the determination

(3) An alternative method of access to legal materials shall be instituted to permit effective legal research for any prisoner excluded from the law library. A legal coordinator shall visit any excluded prisoner to determine his or her law library needs upon request

(4) Any person affected by a determination made pursuant to this subdivision (j) may appeal such determination to the Board

(i) The person affected by a determination shall give notice in writing to the Board and to the Department of his or her intent to appeal the determination.

(ii) The Department and any person affected by the determination may submit to the Board for its consideration any relevant material in addition to the written determination

(iii) The Board or its designee shall issue a written decision upon the appeal within five business days after it has received notice of the requested review.

## SECTION 1-10 VISITING

(a) Policy

Prisoners are entitled to receive personal visits of sufficient length and number

(b) Visiting and Waiting Areas

(1) By September 1, 1978, a visiting area of sufficient size to meet the requirements of this Part shall be established and maintained in each institution

(2) The visiting area shall be designed so as to allow physical contact between prisoners and their visitors as required by Section 1-10 (f)

(3) The Department shall make every effort to minimize the waiting time prior to a visit Visitors shall not be required to wait outside an institution unless adequate shelter is provided and the requirements of Section 1-10 (b) (4) are met

(4) All waiting and visiting areas shall provide for at least minimal comforts for visitors, including but not limited to:

(i) sufficient seats for all visitors;

(ii) access to bathroom facilities and drinking water throughout the waiting and visiting periods;

## DECLARATION OF SERVICE

**DEBORAH A. DORFMAN**, under penalty of perjury, declares pursuant to 28 U.S.C. §1746 that, on January 25, 2008, I caused a true and correct copy of the Defendants' Notice of Motion to Dismiss Plaintiff's Amended Complaint and Defendants' Memorandum of Law In Support of their Motion to Dismiss Plaintiff's Amended Complaint, attached thereto, to be served by First Class Mail and E-mail on Michelle H. Schott, Esq., attorney for plaintiff, at Stroock & Stroock, & Lavan, LLP, 180 Maiden Lane, New York, New York, 10038-4982, the address designated for that purpose.

Dated:      New York, New York
              January 25, 2008


By:         _____
               Deborah A. Dorfman
               Assistant Corporation Counsel